UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MARK WILLIAM LATIMER,                    CIVIL NO. 16-3601 (MJD/DTS)

       Plaintiff,

v.                                       **REPORT AND RECOMMENDATION**

WARDEN MICHELLE L. SMITH,
*Official Capacity;*
LT. JOHN MAGADANZ;
BRIAN GETTE;
DEREK MAGLE;
DEAN SLATKO;
DOCTOR STEPHEN CRAANE; and
NURSE DANIELLE KENYON,
*Individual capacities,*

       Defendants.

---

Mark William Latimer, Reg. No. 207687, MCF-Oak Park Heights, 5329 Osgood Ave. N., Stillwater, MN 55082, *Pro Se* Plaintiff

Bradley Simon, Esq. and Rachel E. Bell, Esq., Minnesota Attorney General's Office, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for Defendants Michelle L. Smith, John Magadanz, Brian Gette, Derek Magle, Dean Slatko, Kelly Classen, Kathy Reid and Danielle Kenyon

Anthony J. Novak, Esq. and Mark A. Solheim, Esq., Larson King, LLP, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101, for Defendant Stephen Craane

---

### INTRODUCTION

Plaintiff Mark William Latimer alleges that prison officials used excessive force against him and were deliberately indifferent to injuries he sustained from that use of excessive force, all in violation of his constitutional rights. *See* 42 U.S.C. § 1983. The parties have filed cross-motions for summary judgment on Latimer's claims. *See* Docket Nos. 71, 102 and 110. This Court recommends that defendants' motions for

summary judgment be granted, that Latimer's motion for summary judgment be denied, and that this matter be dismissed with prejudice.

## FINDINGS OF FACT

Except as indicated, the following facts are not contested by the parties:

Latimer was at all times relevant to this lawsuit a prisoner at the Minnesota Correctional Facility – Oak Park Heights ("MCF-OPH"). On April 8, 2016, Latimer resided in Complex 5, the less restrictive of two segregated living units at MCF-OPH. *See* Affidavit of John Magadanz ("Magadanz Aff.") ¶¶ 6-7 [Docket No. 115]. A nurse that morning brought Latimer his prescribed medication, which he had been refusing to take for several days prior. *See* Deposition of Mark William Latimer ("Latimer Dep.") at 29-30 [Docket No. 133-1]. Latimer continued insisting the morning of April 8 he did not want his medication and, rather than taking the pills as prescribed or returning them to the nurse, he flushed them down the toilet. *Id.*

Prison guards Brian Gette and Matt Cash assisted the nurse during medicine delivery in Complex 5 on April 8. *See* Affidavit of Brian Gette ("Gette Aff.") ¶ 4 [Docket No. 118]. Cash, who is not a defendant to this lawsuit, informed Gette that Latimer had either flushed his medication or had pretended to. *Id.* ¶ 6. To prevent hoarding or improper sharing of medication, prisoners are generally not allowed to retain prescription medicine in their cells. *Id.* ¶ 7; Affidavit of Steven Ayers ("Ayers Aff.") ¶ 13 [Docket No. 114]. Gette and Cash therefore prepared to conduct a search of Latimer's cell for the missing medication. Gette Aff. ¶ 8. Other officers were also called at or around that time to assist with the upcoming search. *See* Latimer Dep. at 31.

Latimer was summoned by officers to his cell's book pass — a small, rectangular slot used to pass materials into or out of a cell without opening the cell door — and

asked him to place his wrists inside. Gette Aff. ¶ 8; Ayers Aff. Ex. 3 at 2 [Docket No. 114-1 at 8]. The parties disagree about what exactly happened next. According to the defendants, Latimer responded belligerently to the request to approach the book pass and initially refused. *See* Gette Aff. ¶¶ 8-9. Defendants further argue that although Latimer eventually did place his hands in the book pass as requested, he tried pulling his arms back into the cell as soon as officers grabbed them in preparation for applying handcuffs. *Id.* ¶¶ 10, 12. By contrast, Latimer alleges that the officers did not attempt to handcuff him at all. *See* Latimer Dep. at 33. Instead, Latimer claims that after placing his hands in the book pass, one of the guards "grabbed my arms and began to twist on them in an attempt to [break] them." Compl. at 6 [Docket No. 1]. Regardless of which version is correct, Latimer succeeded in breaking the grip of the officers and returned his arms to the cell. *See* Gette Aff. ¶ 12.

The situation deteriorated from there. Latimer began throwing items found in his cell, such as eyeglasses, at the officers through the book pass. *See* Latimer Dep. at 35. After again attempting to verbally induce Latimer to submit peaceably to handcuffs and a cell search, prison officials (following warnings) sprayed a chemical irritant into Latimer's cell. *See id.*; Magadanz Aff. ¶ 12; Affidavit of Derek Magle ("Magle Aff.") ¶ 12 [Docket No. 119]. Latimer then placed his hands into the book pass once again, but either resisted efforts to be handcuffed (in defendants' view) or countered renewed attempts by officers to twist his arms and thereby cause injury (in Latimer's view). In either case, the parties returned to square one, with Latimer wholly unrestrained within his cell and determined to remain that way, and prison guards determined to get into the cell to search for the missing medication.

3

Defendant John Magadanz, at that time a correctional lieutenant at MCF-OPH, then authorized a cell entry.  *See* Magadanz Aff. ¶¶ 1, 12.  Latimer did not go down without a fight.  As the first officer (defendant Magle) entered the cell, Latimer grabbed him around the waist and, by Latimer's own admission, would have punched or kicked him if he had gotten the chance.  *See* Latimer Dep. at 37-38; *accord* Magle Aff. ¶ 17.  But Latimer did not get the chance; approximately six officers wrestled Latimer to his bunk and applied restraints, including handcuffs and a spit mask.  *See* Latimer Dep. at 46-47; Ayers Aff. Ex. 3.  Further, Latimer alleges that while he was being pinned atop his bunk, one of the officers started "squeezing" or "crushing" his head.  *See* Latimer Dep. at 37, 41.

Latimer unquestionably suffered injuries because of these events, but the exact cause and the extent of those injuries remains in dispute.  The parties agree, and the medical record establishes, that after the altercation Latimer was suffering from a broken left wrist.  *See* Novak Aff. Ex. at 5-6 [Docket No. 106].  Defendants argue that Latimer could conceivably have broken his wrist at any time during the events described above but contend that their use of force was nevertheless reasonable under the circumstances.  Latimer contends that prison officials injured his wrist *after* he had been restrained atop his bunk, rendered compliant, and placed into handcuffs.  *See, e.g.* Compl. at 13; Latimer Dep. at 46.  Latimer also contends that he suffered several injuries other than a broken left wrist because of the cell entry, including a damaged right wrist, thumb, and ribs, along with a head injury that resulted in hallucinations and memory loss.  *See, e.g.*, Compl. at 13.

After the cell entry, prison officials led Latimer from his cell in Complex 5 to the Administrative Control Unit, the more restrictive of the two segregated living units at

4

MCF-OPH.  *See* Magadanz Aff. ¶ 16.  Latimer was handcuffed behind his back during the walk from Complex 5 to the Administrative Control Unit.  *See* Magle Aff. ¶ 23.  Three officers, one of them Magle, controlled Latimer's hands and arms along the way.  *See* Wheeler Aff. Ex. 8 [Docket No. 116-2] (handheld security video).  Latimer alleges that, during the walk, at least one of the officers intentionally "twisted and yanked on my broken and injured wrists" in order to inflict pain.  *See* Compl. at 7.

Latimer declined medical attention in the hours immediately after the cell entry.  *See* Wheeler Aff. Ex. 8; Affidavit of Danielle Kenyon ("Kenyon Aff.") ¶¶ 10, 13 [Docket No. 127].  That evening of April 8, however, Latimer pushed a duress button in his cell and requested to see a medical professional.  *See* Affidavit of Dean Slatko ("Slatko Aff.") ¶ 9 [Docket No. 131].  Defendant Dean Slatko, a prison guard on duty in the Administrative Control Unit, responded to the call.  *Id.*  The specific medical concerns that Latimer relayed remain in dispute, but the parties agree that Latimer told Slatko he had been injured during the morning's events, and that Slatko requested to the appropriate parties that Latimer be seen by a nurse.  *See* Latimer Dep. at 50-51.

The parties' accounts diverge after this.  Latimer contends that he pressed the duress button several more times, was told by Slatko on each occasion that a nurse would be coming, and that a nurse did not at any point speak with him that evening.  *See* Latimer Dep. at 51-52.  According to Latimer, a combination of hallucinations and shock caused him to pass out on his cell floor.  *Id.* at 51.  When he awoke, Latimer claims that he could see the trousered legs of one of the officers, who he assumes to have been Slatko.  *Id.*  Latimer could also hear the voice of defendant Danielle Kenyon, the nurse then on-call in the Administrative Control Unit, from a few cells away.  *Id.*

Latimer claims that never did Kenyon or anyone else offer him medical assistance on the evening of April 8.[1]

Slatko agrees that Latimer pushed the duress button in his cell several times the evening of April 8.  *See* Slatko Aff. ¶ 9.  Slatko further attests that he informed a nurse "that Latimer had been complaining about his arm," *id.* ¶ 11, and that he and another correctional officer accompanied Kenyon during the evening pill run in the Administrative Control Unit, *id.*  But Slatko denies that he ever saw Latimer unconscious, though he does not remember the specific interaction he, Kenyon, and Latimer may have had while pills were being handed out.  *Id.*

Kenyon offers a markedly different account from Latimer.  According to Kenyon, she *did* attempt to assess Latimer's injuries on the evening of April 8.  Throughout the encounter, says Kenyon, Latimer "kept his left arm or hand covered by his jumper and kept it hidden."  Kenyon Aff. ¶ 16.  Latimer complained about pain in his left arm but was "verbally abusive and uncooperative," going so far as "trying to throw an orange peel" at Kenyon during the encounter.  *Id.*  Kenyon attests that Latimer was standing throughout the meeting.  *Id.*  Because Latimer had been non-compliant, Kenyon declined further interaction at that time.  *Id.*  Administration records taken by Kenyon on the night at issue note that she was scheduled to deliver prescription medication to Latimer at or around 8:00 p.m., that she had arrived at Latimer's cell (or wrote down the results of that visit) at 9:16 p.m., and that Latimer had "refus[ed]" the medication and been "non-compliant."  *See* Reid Aff. Ex. 4 at 15 [Docket No. 124].

---

[1]    In a grievance kite submitted the next day, Latimer told prison staff that when he awoke, "the nurse was laughing and telling the guard she hoped my arm which was broken hurt really bad, that she would teach me not to cuss out nurses again."  Latimer Ex. at 7 [ECF No. 73].  These allegations were omitted from both the complaint and Latimer's briefing.

The following day, April 9, Latimer was at first uncooperative with prison medical staff.  *See id.*; Affidavit of Jacob Schroeder ("Schroeder Aff.") ¶ 7 [Docket No. 128].  At around 8:00 p.m. that evening, Latimer requested pain medication for his arm and a headache.  *Id.* ¶ 8.  A standing order was put in for Latimer to receive Tylenol on an as-needed basis, and Latimer was added to the list of patients to be seen by the prison doctor on Monday, April 11, the next day that a doctor would be present at MCF-OPH. *Id.* ¶ 9.

Defendant Stephen Craane, a privately employed physician who provides medical services at MCF-OPH, ordered X-rays of Latimer's left wrist on April 11.  *See* Novak Aff. Ex. at 5-6.  The X-rays revealed a fracture to Latimer's left distal radius.  *Id.* Craane met with Latimer the next day (April 12) to go over the X-ray results and address any other medical concerns Latimer might have.  *Id.* at 11.  Craane's notes from this appointment record that Latimer's wrist was placed in a fiberglass cast at that time.  *Id.*  Latimer also reported a "multiple week history of generalized headache" according to Craane's records, which noted that "[Latimer] recalls no activity or trauma which preceded the onset of these headaches . . . ."  *Id.*  No further pain medication was prescribed or recommended at that time, though three days later Craane noted that Latimer should continue to take Tylenol as necessary.  *Id.* at 9.

Latimer contends that he also voiced concerns about hallucinations and memory loss with Craane at the April 12 meeting, but that Craane ignored his complaints.  *See* Latimer Dep. at 48.  According to Latimer, these hallucinations lasted about six or seven weeks, beginning from the date of the cell entry, and occurred "constantly" for much of that period.  *Id.* at 49.  The memory loss, which is alleged to have entirely erased Latimer's early childhood recollections, has been ongoing.  *See* Compl. at 11.  None of

7

Craane's medical records from the months following the cell entry mention these hallucinations or memory loss.  *See generally* Novak Aff. Ex. A.  Nor has any other medical professional diagnosed Latimer with either these symptoms or with any underlying head or brain injuries.  *See* Latimer Dep. at 71, 73.

## CONCLUSIONS OF LAW

## I.    <u>Discovery Disputes</u>

Although not labeled as such, Latimer's motion for summary judgment is in many respects a motion to compel discovery from the defendants.  *See* Docket No. 71.  One aspect of that quasi-motion to compel — whether Latimer should be afforded access to a security video showing the events outside of his cell on the morning of April 8, 2016 — has already been granted in part and denied in part.  *See* Docket No. 149.  This Court will now address the remainder of the issues regarding discovery put forward by Latimer.

Many of the issues may be attended to briefly.  As an initial matter, Latimer alleges that defendants generally have failed to comply with their obligations under the Federal Rules of Civil Procedure by refusing to answer written interrogatories and failing to turn over relevant evidence.  Most of Latimer's allegations are cryptic; even where they are not, they are largely meritless.  For example, Latimer complains that defendants refused to answer certain interrogatories on the grounds that he had exceeded the number of interrogatories permitted under Fed. R. Civ. P. 33(a)(1) ("Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts.").  But defendants were justified in doing so; Latimer directed over 100 questions (including discrete subparts) at the defendants over the course of his interrogatory requests, with

8

many of those questions directed at *each* of the defendants, not any particular defendant.[2]  *See* Docket No. 54.  In any event, Latimer does not identify any particular interrogatory that he believes should have been answered but was not.  *See* D. Minn. L.R. 37.1 (requiring that a motion to compel discovery include "a specification of the disclosure or discovery in dispute," "the text . . . of any interrogatory [in dispute]," and "the remedy sought, together with an argument for why the requested remedy is authorized and justified.").

Latimer's requests to compel production of documents from the defendants are similarly unfocused.  With only a handful of exceptions (addressed below), Latimer argues simply that defendants must be in possession of more evidence than they have turned over, and he asks that this Court direct defendants to provide these supposedly missing materials.  For the most part, though, Latimer has not offered a compelling reason to believe that any of these discovery materials actually exist.  For instance, Latimer expresses incredulity that emails regarding the use-of-force investigation conducted following the events at issue have not been provided to him.  *See* Docket No. 71 at 14.  Yet Latimer offers no evidence that defendants or non-party witnesses were lying when they told him that no such emails exist beyond what was already given to him during discovery.

Latimer's most substantial arguments come with respect to security videos taken on the relevant days.  According to Latimer, defendants shirked their duties under the Federal Rules of Civil Procedure in three respects regarding these videos.  First, defendants have turned over only two of the relevant videos, when (Latimer argues)

---

[2]    Latimer also directed certain of the interrogatories at non-parties to this action.  *See* ECF No. 54.  Rule 33 does not allow interrogatories to be directed at non-parties.

many more such videos must have been created.  Second, Latimer contends that one of the videos has been edited to omit footage showing prison guards twisting his arms in the book pass prior to the cell entry.  Third, Latimer contends that defendants or other unnamed Minnesota Department of Corrections officials destroyed a specific video showing events outside his cell on the evening of April 8, 2016.

This Court will reserve analysis of Latimer's third argument — concerning destruction of the security video from the evening of April 8 — until its discussion of the deliberate-indifference claims brought against Slatko and Kenyon.  Latimer's other two arguments will be addressed here.

First, defendants deny that any video of the events at issue was ever captured except for the two videos now provided to Latimer and the third video, referenced above, from the evening of April 8, 2016, which defendants assert was destroyed pursuant to a general retention policy.  Again, this Court will defer discussion about this third video until later in this Report and Recommendation.  It suffices to note for now that Latimer does not provide a compelling argument that any *other* video of the events at issue ever existed.[3]  And obviously, defendants cannot be expected to preserve or turn over videos that did not exist.

Second, Latimer contends that handheld video footage taken by a correctional officer during the cell entry and immediate aftermath was edited to exclude footage from immediately before the cell entry.  *See* Wheeler Aff. Ex. 8 (handheld video).  Had this

---

[3]    Certain of the videos which Latimer claims to have existed strain credulity.  For example, Latimer contends that a video was taken of his walk to the Administrative Control Unit from the perspective of his front — that is, facing towards him as he walked forward.  But the extant video of the walk to the Administrative Control Unit, which was taken from behind Latimer, would have shown any additional footage being taken from the other angle.  *See* Wheeler Aff. Ex. 8.

video not been truncated, Latimer argues, the footage would have shown officers twisting his arms as described in the complaint. Latimer's claim is belied by another security video taken at the same time, which shows a correctional officer grabbing a handheld video recorder and beginning to record events approximately 75 seconds before the cell entry. *See* Docket No. 150. Consistent with that overhead security footage, the handheld video begins about 75 seconds before officers enter Latimer's cell. *See* Wheeler Aff. Ex. 8. Nothing was edited from the video made available to Latimer and the Court.

Accordingly, Latimer is not entitled to relief with respect to the discovery challenges discussed above. This Court will now turn to the parties' cross-motions for summary judgment.

## II.  Summary Judgment[4]

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might

---

[4]  Rather than file a responsive brief to defendants' motions for summary judgment, Latimer submitted an "affidavit" that consists largely of argument rather than sworn statements of fact. *See* ECF No. 141. To the extent that Latimer offers statements in that "affidavit" as evidence in support of his own motion for summary judgment, it is untimely, *see* D. Minn. L.R. 7.1(c), and consideration of the new purported evidence in the affidavit would prejudice defendants, who were deprived of the opportunity to respond to the affidavit in their briefs in response to Latimer's summary-judgment motion. The document is also untimely insofar as it is intended as a brief rather than a true affidavit, *see* D. Minn. L.R. 7.1(c)(2), but because the delay did not substantially prejudice defendants in that respect, Latimer's arguments in that document have been considered by this Court. Latimer's "opposition to motion to dismiss my affidavit" [ECF No. 143] is therefore recommended to be granted in part and denied in part — granted insofar as his arguments should be considered (as this Court has done) and denied insofar as statements in that affidavit should not be used as evidence in support or opposition to the motions for summary judgment.

affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Excessive Force

"[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000) (citing *Whitley v. Albers*, 475 U.S. 312, 318-22 (1986)).  "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  The Eighth Circuit has explained that

> [t]his inquiry turns on "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted," from which "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."

*Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017) (quoting *Whitley*, 475 U.S. at 321).  "[T]he subjective motivations of the individual officers are of central importance in deciding whether force [was] used maliciously and sadistically to cause harm in violation of the Eighth Amendment."  *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014) (quotation omitted).

### (1)    Defendant Smith

Among the defendants to this action is Michelle Smith, named in her official capacity as warden at MCF-OPH at the time of the events at issue.  When sued for monetary damages, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  "Additionally, the Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially 'for the recovery of money from the state.'"  *Treleven v. University of Minnesota*, 73 F.3d 816, 818 (8th Cir. 1996) (quoting *Ford Motor Co. v. Dep't of the Treasury*, 323 U.S. 459, 464 (1945) (footnote omitted)).  Thus, to the extent that Latimer seeks monetary compensation from Smith in her official capacity under § 1983, his attempts stumble at the starting block.[5]

That said, state officials sued in their official capacities for only prospective injunctive relief *are* "persons" for purposes of § 1983, *see Will*, 491 U.S. at 71 n.10 (citing, inter alia, *Ex parte Young*, 209 U.S. 123, 159-60 (1908)), and the Eleventh Amendment does not bar suits for declaratory or injunctive relief against official-capacity defendants, *see Rose v. Nebraska*, 748 F.2d 1258, 1262 (8th Cir. 1984).  Still, though, to succeed on official-capacity claims against Smith or any other state actor, Latimer

---

[5]    Individual-capacity claims against a defendant cannot be implied from a complaint, *see Egerdahl v. Hibbing Community College*, 72 F.3d 615, 619-20 (1995), but even if Latimer's complaint were read as pleading individual-capacity claims against Smith, he still would not be entitled to recovery against her.  Smith is not alleged in the complaint to have had any personal involvement in any of the events at issue, and the only explanation offered by Latimer regarding his inclusion of Smith is her supervision of *others* who are alleged to have violated his rights, along with possible personal involvement in the denial of certain grievances.  *See* Latimer Dep. at 75-76.  Neither of these things, without more, is grounds for personal liability under § 1983.  *See Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006); *Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam).

must demonstrate "an ongoing violation of federal law" in order to justify the imposition of injunctive relief. *Randolph v. Rodgers*, 253 F.3d 342, 348 (8th Cir. 2001). Latimer's claims are entirely backward-looking; he alleges that his rights were violated during the course of the events at issue, not that they continue to be violated or that he is in material danger of suffering similar harms in the future. Moreover, although Latimer refers vaguely to policies that, if enacted by Smith or other corrections officials, could possibly have prevented his injuries, *see* Compl. at 7-8, he never identifies a concrete policy change that could be implemented to prevent similar events from occurring in the future.

Latimer cannot seek monetary compensation from Smith in her official capacity, and he has not adequately explained the basis upon which he might seek injunctive relief from her. Accordingly, defendants' motion for summary judgment should be granted with respect to Smith.

### (2)    Defendants Gette and Magle

Prison guards and defendants Brian Gette and Derek Magle participated in the events surrounding the April 8 cell entry. Latimer alleges that guards at MCF-OPH, including Gette and Magle, used excessive force against him on four occasions during those events: (1) by twisting his arms after he was asked to place them in the book pass prior to the cell entry; (2) by breaking his wrist after he was restrained and handcuffed; (3) by applying unnecessary pressure to his head while restraining him; and (4) by jostling his arms and injured wrists during the walk to the Administrative Control Unit. These four claims require separate analyses and will therefore be considered individually.

### (a)    Twisting of Arms at Book Pass

Twice prior to the cell entry, Latimer placed his hands and wrists inside his cell's book pass in order to be handcuffed.  On each occasion, Latimer retracted his arms into the cell.  The parties disagree as to what motivated that withdrawal.  Defendants argue that the behavior was of a piece with Latimer's broad-spectrum belligerence that morning.  Latimer argues that prison guards had grabbed and twisted his arms in an attempt to cause deliberate injury.

Gette and Officer Tim Farell (who is not a defendant to this action) were involved in the first incident at the book pass; Magle and an unknown officer were involved in the second.  *See* Gette Aff. ¶ 10; Magle Aff. ¶ 15.  Hard evidence from the incidents is lacking.  The security video taken from outside Latimer's cell shows, consistent with both stories, that twice something happened at Latimer's book pass, but it is impossible to tell from the video whether the guards *twisted* Latimer's arms or merely *grabbed* his arms in the process of handcuffing Latimer.  *See* Docket No. 150 (overhead security video); Gette Aff. ¶ 11 (attesting that grabbing an inmate's arms during handcuffing is necessary to avoid the inmate from pulling the handcuffs back into the cell, where they can be used as a weapon.)  The affidavits of Gette and Magle (on the one hand) and Latimer's deposition testimony (on the other hand) establish the parties' competing versions of events but cannot be used to determine conclusively that any of those versions of events is correct.

Three factors, however, necessitate summary judgment in behalf of defendants.  First, there is no evidence in the record tending to suggest that either Gette or Magle had subjective motivation to cause harm.  *See Burns*, 752 F.3d at 1139 ("[T]he subjective motivations of the individual officers are of central importance in deciding

15

whether force [was] used maliciously and sadistically to cause harm in violation of the Eighth Amendment." (quotation omitted)).  Neither Gette nor Magle had ever had any interaction with, or knowledge of, Latimer prior to April 8, 2016.  *See* Gette Aff. ¶ 5; Magle Aff. ¶ 10.  The episode involving Gette, the first of the two incidents at the book pass, took place before the situation had escalated to any appreciable extent.  Gette's subjective motivation for causing harm — and thereby risk fueling what to that point had been a limited conflagration — is therefore impossible to discern.  And Latimer himself suggests no plausible reason for Gette to want to wantonly or maliciously inflict pain upon him during this initial encounter.  In Magle's case, the situation had deteriorated in many ways by the time of his involvement in the second of the two incidents at the book pass.  But even here, Latimer and Magle agree that Latimer had agreed to approach the book pass pacifically.  Magle's motive for risking loss of control over the situation by causing deliberate harm to Latimer and reigniting his wrath is difficult to fathom.  Nothing in the record suggests such a motivation.  And establishing that motive is critical to Latimer's excessive-force claim.  *See Hudson*, 503 U.S. at 6-7.

Second, although the absence of serious injury resulting from the alleged use of excessive force does not by itself defeat a claim brought under the Eighth Amendment, *see Wilkins v. Gaddy*, 559 U.S. 34, 36-38 (2010) (per curiam), it remains the case that "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation," *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321); *accord Wilkins*, 559 U.S. at 37-38.  Latimer does not allege that he suffered *any* injury, apart from momentary discomfort, due to the incidents at the book pass.  On his telling, his wrist injuries came during the cell entry, not before.  The *de minimis* nature of Latimer's injuries resulting

16

specifically from the book pass incidents does not alone defeat his Eighth Amendment excessive-force claims.  But the lack of injuries from these incidents does strongly suggest that the quantum of force used by guards at the book pass was not far out of line with what was reasonable and necessary to restrain Latimer under the circumstances.  *See* Gette Aff. ¶ 11; *Hudson*, 503 U.S. at 9 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action.").

Third, the evidence tying Gette and Magle personally to the alleged misconduct is weak.[6]  *See, e.g.*, *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (per curiam) ("But § 1983 liability is personal.  The question here is whether the conduct of [the specific defendants] was constitutionally unreasonable.").  The complaint does not specify which guard is alleged to have done any specific action, but instead claims generally that guards used excessive force in various ways and that Gette and Magle were among those guards.  *See* Compl. at 6-7.  But on each occasion, another guard not named as a defendant accompanied Gette and Magle at the book pass.  Nothing in the evidence distinguishes their conduct from that of Gette or Magle.  Put another way, nothing in the evidence, including Latimer's own deposition testimony, establishes that it was Gette and Magle specifically, and not the other officers at the book pass, who twisted his arms.  Latimer cannot seek recovery from Gette and Magle personally for actions that those individuals did not commit.

Combined, these factors leave too little from which a reasonable factfinder could conclude that Gette or Magle used excessive force at the book pass.

---

[6]    Indeed, Latimer stated during his deposition that Gette was included in this action not due to his actions at the book pass, but because "he was the one breaking my arm or squeezing my head" during the cell entry.  Latimer Dep. at 76.  But Gette was not one of the officers involved in the cell entry.  *See* Gette Aff. ¶ 18.

### (b)    Broken Wrist

Latimer does not claim in his complaint that the cell entry itself, or that the use of force during that cell entry, was *per se* unreasonable.[7]  Instead, Latimer alleges that *after* he had been fully restrained and handcuffed during the cell entry, one of the half dozen or so officers who participated in the cell entry deliberately broke his wrist. Nothing in the evidentiary record either confirms or refutes this claim; the available medical record does not state that Latimer broke his wrist due to any particular type of force, *see* Novak Aff. Ex., and the best recording of the event does not reveal whether Latimer was injured purposefully after being handcuffed (which would amount to excessive force) or whether his injuries were suffered while officers struggled to restrain him (which would not amount to excessive force), *see* Wheeler Aff. Ex. 8 (handheld security video).

It is not enough, though, for Latimer establish a dispute of fact over the general question of whether excessive force was used.   Rather, in attempting to defeat defendants' motion for summary judgment, Latimer must establish a reasonable dispute of fact that one of the named defendants *themselves* committed excessive force.  *See Doran*, 409 F.3d at 965; *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

---

[7]     Latimer does float the idea in his briefing that the officers had no right to enter his cell at all on Fourth Amendment grounds, but as explained with respect to the claims brought against Magadanz, this (unpleaded) claim is meritless.  *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

This Latimer has not done.  With respect to Gette, the evidence in the record fails to establish — indeed, positively contradicts — that he was involved in the cell entry at all, much less that he used excessive force during that cell entry.  *See* Gette Aff. ¶ 11; Wheeler Aff. Ex. 7 at 5 [Docket No. 116-1 at 54]; Wheeler Aff. Ex. 8 (security video).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A factfinder could not reasonably conclude that Gette was in any way responsible for any alleged use of excessive force occurring during or after the April 8 cell entry.

Magle, by contrast, was indisputably involved in the cell entry; he was the first officer to enter Latimer's cell and can be seen restraining Latimer throughout much of the video of the events.  *See* Magle Aff. ¶ 17; Wheeler Aff. Ex. 8 (video).  Still, though, Magle's mere involvement in the cell entry does not by itself tend to establish that he was responsible for Latimer's broken wrist, much less that he maliciously and sadistically directed excessive force toward that wrist.  Approximately six officers were involved in the cell entry.  Latimer admitted in his deposition that he was "not sure what role, basically, almost any of them played" and that he was "not sure" of which guards "broke my arm."  Latimer Dep. at 76.  In fact, when asked to identify why Magle in particular had been identified as a defendant, Latimer said that it was due to his being one of the guards involved at the book pass, not due to his actions inside the cell.  *Id.* at 77.  Even on Latimer's version of events, then, a reasonable factfinder could not conclude that Magle himself used excessive force with respect to Latimer's wrist.

The video of the incident, although far from conclusive in and of itself, corroborates that conclusion. Magle was the first officer to enter Latimer's cell and was equipped with a large shield that was used both to protect himself and to knock Latimer to his bunk. *See* Wheeler Aff. Ex. 8. This bulky equipment would have made it nearly impossible for Magle to direct force, excessive or otherwise, precisely towards Latimer's wrists,[8] and indeed Magle can be seen throughout much of the video helping to pin Latimer to his bunk while *other* officers handcuffed Latimer. *Id.*

Thus, even assuming that Latimer's broken wrist was the result of excessive force, there is no evidence from which to conclude that either Magle or Gette themselves was responsible for that excessive force. Without such evidence, a factfinder could not reasonably find those defendants personally liable for Latimer's injury.

### (c)   Pressure on Head

During the cell entry, prison guards restrained Latimer's head. Latimer alleges that he suffered headaches, hallucinations, and memory loss as a result of this restraint of his head and that the restraint therefore amounted to excessive force.[9]

---

[8]   Again, it is worth stressing that Latimer's claim hinges on the fact that he was injured not during the natural course of the cell entry, but due to wanton and gratuitous use of force *after* he had been subdued, directed precisely at his wrists with the intention of breaking them. Magle, along with the other MCF-OPH officers, no doubt used force against Latimer as he entered the cell, and that force may (or may not) have caused the fracture to Latimer's wrist. But that initial use of force during the cell entry was also reasonable under the circumstances, as Latimer himself recognizes. It therefore cannot be the basis for an excessive-force claim.

[9]   Though, as explained below with respect to Latimer's deliberate-indifference claims, the hallucinations and memory loss have never been diagnosed by a medical professional. *See* Latimer Dep. at 71, 73.

Latimer again admits, as he did regarding the broken wrist, that he does not know "which [guard] did what." Compl. at 13; *accord* Latimer Dep. at 76-77. This, by itself, largely dooms his attempt to recover specifically from Magle as a result of that alleged use of excessive force[10] (Gette, recall, did not enter Latimer's cell and could not have been the officer who restrained his head). *See Doran*, 409 F.3d at 965 ("[Section] 1983 liability is personal."). But the excessive-force claim also fails for another, more fundamental reason: A factfinder could not reasonably conclude from the evidence in the record that excessive force was applied to Latimer's head at all.

Latimer's own testimony sets the stage for why this is so: "[T]hey pin your head so you can't struggle, so you can't give them any problems, you know, to control you, to control movement. And [the guard] was just a little bit too big, little bit too heavy and squeezed a little bit too hard for a little bit too long, that's all." Latimer Dep. at 41. Missing from this candid description is any accusation of intent to cause harm. Quite the opposite, in fact: Latimer admits that his head was restrained "to control movement," *id.*, a legitimate concern under the circumstances faced by the officers during the cell entry. It would not be enough for Latimer to show that the amount of force applied by officers in accomplishing that legitimate goal was marginally greater than absolutely necessary. Latimer must instead show that "the force used was so greatly in excess of that needed to restore and maintain order as to raise a reasonable inference of malicious motive." *Burns*, 752 F.3d at 1140. And, as quoted above, Latimer himself

---

[10] That said, Latimer's claim that Magle was responsible for the head restraint is more plausible than his claim that Magle was responsible for the wrist injuries. Throughout the relevant portion of the video recording the cell entry, Magle can be seen attempting to pin Latimer to the ground, and although the positioning of Latimer's body is not entirely clear from the video, it appears that Magle spends at least part of the time near or above Latimer's head. *See* Wheeler Aff. Ex. 8.

disclaims in his deposition testimony that this was the case. *See* Latimer Dep. at 41. Defendants' motion for summary judgment should be granted with respect to this aspect of Latimer's excessive-force claim as well.

**(d)    Walk to Administrative Control Unit**

Latimer's final excessive-force claim relates to the events immediately after the cell entry. Latimer was escorted by three guards from Complex 5 to the Administrative Control Unit. During that walk, Latimer alleges, "the guard twisted and yanked on my broken and injured wrists. This was done only to make me scream in pain it was a[n] unnecessary and wanton infliction of pain there was no penolagal [sic] or legitimate reason or purpose to twist and yank on my broken hand." Compl. at 7. Never does Latimer identify any particular prison guard as responsible for the alleged intentional infliction of pain, though the video from the event shows clearly that Magle was one of the three guards who accompanied Latimer on the walk. *See* Wheeler Aff. Ex. 8. (The other two guards are not among the defendants named to this lawsuit.)

The video — which captured every moment from the cell entry until Latimer's cell door in the Administrative Control Unit was closed — fatally undermines Latimer's claim of excessive force along the walk. Unlike the footage of the cell entry itself, much of which is obscured by the bodies of the guards effecting the entry, the walk from Complex 5 to the Administrative Control Unit (and the actions of the guards who escorted Latimer) is clearly captured by the recording. *See* Wheeler Aff. Ex. 8. The video shows that, throughout the walk, the two unnamed guards guided Latimer — who can often be seen passively resisting the officers — from the side by grabbing his arms

22

above the elbow, far from his injured wrist.[11]  *Id.*  Magle walked behind Latimer and the two other guards.  *Id.*  Although Magle's hand was in fact near Latimer's wrists for much of the walk, the video, which was well positioned to capture any malfeasance, reveals no twisting, jostling, or other untoward behavior by Magle.  Contrary to Latimer's description of events, in which he claims to have been "screaming as loud as I could in pain," Docket No. 71 at 5, the vast majority of the walk was spent in silence, *see* Wheeler Aff. Ex. 8.

No doubt the walk to the Administrative Control unit was uncomfortable for Latimer, who had almost certainly broken his wrist by this point and yet remained handcuffed and secured by officers.  But the video recording of the events demonstrates that Latimer's claim of intentional infliction of injury is simply untrue. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. at 380, 381 (admonishing further that the lower court "should have viewed the facts in the light depicted by the videotape").  A factfinder could not watch the video and reasonably conclude, *contra* Latimer's allegations, that Magle or the other officers used excessive force against him during the walk to the Administrative Control Unit.  This claim should also be dismissed, along with the others directed at defendants Gette and Magle.

---

[11]    Some amount of force was necessary on the walk not only to protect the guards from the recently recalcitrant Latimer, but also to protect Latimer himself, who was handcuffed behind his back and therefore vulnerable to injury should he fall.

### (3)    Defendant Magadanz

Officer Magadanz authorized the cell entry during which Latimer was injured. *See* Magadanz Aff. ¶ 12.    He also supervised the cell entry as it happened.    *Id.* Magadanz is one of eight defendants sued in their individual capacities for their role in the events.

At the outset, the scope of Latimer's claims brought against Magadanz requires clarification.    Unraised by the pleading is any accusation that Magadanz was *directly* responsible for Latimer's injuries; that is, Magadanz did not break Latimer's wrist, restrain Latimer's head, or otherwise inflict physical harm himself upon Latimer. Further, Latimer does not claim, nor could he reasonably claim, that the fact Magadanz authorized a cell entry, taken alone, was a violation of his Eighth Amendment rights under the circumstances presented to Magadanz at the time he made the authorization.[12]    Rather, Latimer's claims against Magadanz take two forms.    The first is that Magadanz, as the "lieutenant in charge," Latimer Dep. at 76, must have known at the time the cell entry was ordered that other prison officials would inevitably use excessive force.    On this telling, Magadanz and other guards had reached a meeting of the minds beforehand, whether explicitly or implicitly, that the cell entry would be conducted in a manner inconsistent with Latimer's constitutional rights.    Such a claim is cognizable, *see Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018), but falters here, as there is no evidence in the record that Magadanz either authorized

---

[12]    Although Latimer suggests in his briefing that prison officials had no right to enter his cell to search for medication at all, *see* ECF No. 71 at 1, no such claim is raised in the complaint.    Even if it were, the claim would fail.    "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).    Besides which, Magadanz had compelling reasons to order prison guards to conduct a cell search after Latimer had accepted but refused to take his prescribed medication.    *See, e.g.*, Ayers Aff. ¶ 12.

unlawful conduct or was aware before the cell entry of a pattern of unconstitutional acts committed by subordinates, *see S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

The second is that Magadanz was "standing right there" during the cell entry, Latimer Dep. at 76, yet failed to intervene despite knowing that other correctional officers were wantonly inflicting harm upon him. *See* Compl. at 7. Unlike the first claim, which relies upon the supposition that Magadanz knew or should have known that subordinates would use excessive force at the time he authorized the cell entry, this second claim rests on assertion that whatever Magadanz's frame of mind when he authorized the cell entry, he *came* to know as the cell entry was being performed that Latimer's constitutional rights were being violated, then refused to do anything about it.

It is clearly established that a state actor may be liable for the failure to intervene to prevent the unconstitutional use of excessive force. *Cf. Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009) (examining failure to intervene and excessive-force claim in context of Fourth Amendment). Magadanz was present and observing at the time of the cell entry and, in a literal sense, would have seen a culpable officer's actions as he inflicted unnecessary and wanton punishment.[13] But the video of the events in question, which was taken from roughly the perspective Magadanz had of the events, shows that if any officer acted maliciously, the action must have been remarkably

---

[13]    To establish an unconstitutional failure to intervene in the use of excessive force, Latimer must provide sufficient evidence from which a factfinder could conclude that excessive force was used at all. *See Rogers*, 885 F.3d at 1122. As explained above, the evidence is weak that any officer, named or unnamed, used excessive force in any respect during the events at issue. Where the evidence is most equivocal, with respect to Latimer's wrist injury, it is largely so because the video neither proves nor disproves the allegations. *See* Wheeler Aff. Ex. 8. Magadanz's perspective on the events was similar to that provided by the video (as shown by the video itself). *Id.* Thus, if the video fails to definitively establish the use of excessive force against Latimer, knowledge that excessive force was being used cannot fairly be imputed to Magadanz.

subtle, hidden amidst the boisterous but *lawful* use of force in restraining Latimer as he resisted.    *See* Wheeler Aff. Ex. 8.    That these events happened with Magadanz standing nearby is not be sufficient to establish that he knowingly refused to intervene in the use of excessive force by his subordinates.

Defendants' motion for summary judgment on the claims of excessive force against Magadanz should therefore be granted.    Latimer's opposing motion for summary judgment should be denied for the same reasons.

### C.    Deliberate Indifference

Prisoners are protected under the Eighth Amendment from deliberate indifference to their medical needs by state actors.    *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).    "Deliberate indifference has both an objective and a subjective component."    *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).    Under the objective component, a plaintiff must show that he suffered from an objectively serious medical need.    *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014).    "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention."    *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (quotations omitted).    "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'"    *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)).    Under the subjective component, the plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need."    *Scott v.*

*Benson*, 742 F.3d at 340.  This showing amounts to more than negligence or even gross negligence and is instead akin to criminal recklessness.  *Id.*

### (1)    Defendants Classen and Reid

Kelly Classen and Kathy Reid, respectively a nursing supervisor and health services administrator at MCF-OPH at the time of the events at issue, are each named as defendants to this action in their individual capacities.  *See* Compl. at 12.  Neither Classen nor Reid are alleged in the complaint to have had any direct or indirect involvement in the events at issue.[14]  Latimer attempts to hold Classen and Reid responsible for their allegedly poor supervision of *other* nurses, such as Kenyon, who were more closely involved in his medical treatment following the cell entry.  But "[a] supervisor may be liable under § 1983 only if [she] had 'notice of a pattern of unconstitutional acts committed by subordinates.'"  *Mick v. Raines*, 883 F.3d 1075, 1078 (8th Cir. 2018) (quoting *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)).  Latimer's claims fail for lack of evidence both as to "notice" and as to a "pattern of unconstitutional acts."  The most significant allegations of deliberate indifference described in the complaint — that doctors, nurses, and guards ignored Latimer's head injuries and turned a blind eye as Latimer lay unconscious in his cell — are not plausibly alleged to be part of a *practice* of similar behavior by prison officials, and there is no evidence in the record that any similar occurrence has ever taken place at MCF-OPH.  Obviously, then, neither is there evidence of Classen or Reid having notice of such a practice.

---

[14]     At his deposition, Latimer stated that Classen and Reid failed to order necessary medical tests requested by him in the days after the events described in the lawsuit. *See* Latimer Dep. at 78-79.  This failure to order tests, however, is not mentioned in the complaint as a basis for Latimer's deliberate-indifference claim.  *See* Compl. at 12.

The closest Latimer comes to identifying a pattern of behavior that could reasonably be found from the evidence in the record to be known to Classen and Reid is that he was made to "ask the guard to ask the nurse to bring" over-the-counter pain medication, rather than being allowed to keep medication in his cell.   Compl. at 11. Another prison nurse, not named as a defendant to this action, confirmed that although prisoners generally are allowed to purchase Tylenol from the canteen and keep this medication in their cells, prisoners in the Administrative Control Unit do not have access to the canteen, cannot purchase their own medication, and therefore cannot keep that medication with them.   *See* Schroeder Aff. ¶ 9.   But prisoners in the Administrative Control Unit, including Latimer after April 9, do *receive* medication when requested and as authorized by medical professionals.   It is difficult to see how a policy of giving Tylenol to prisoners as requested could be so outrageous as to reflect a state of mind "akin to criminal recklessness" on the part of officials responsible for implementing or supervising that policy.[15]  *Scott v. Benson*, 742 F.3d at 340.

Classen and Reid had practically no involvement in the events over which this lawsuit is concerned, and there is no evidence that their actions or omissions violated Latimer's constitutional rights.   Defendants' motion for summary judgment should be granted with respect to them.

---

[15]    Latimer argues in his briefing that prison officials were not always as expedient as he would have liked in delivering the medication, *see* ECF No. 71 at 10-11, but (1) he does not identify any particular circumstance in which he was denied or delayed medication; (2) he does not describe the length of the delay; and (3) he does not identify any particular defendant or defendants responsible for the delay.    He also acknowledges that he received Tylenol "about five times" in the days between the cell entry and his first visit with defendant Craane.   *Id.* at 11.

### (2)    Defendants Slatko and Kenyon

Latimer declined medical attention for his injuries until the evening of April 8, 2016.  That night, approximately 12 hours after the cell entry, Latimer pushed the duress button in his cell.  Guard Dean Slatko responded to the request, told Latimer that he would inform a nurse of his request, and in fact relayed the request to nursing staff. Latimer's call was deemed not an emergency, and no one came immediately to check on him.  Several more times — exactly how many is not clear from the record — Latimer pushed the duress button, and each time Slatko told Latimer that a nurse would be coming.  On this, all parties agree.

The stories told by the parties diverge drastically thereafter.  Latimer alleges that he lost consciousness in his cell and that, when he awoke, Slatko (or another guard — all Latimer could see was the pants leg of the officer) could be seen watching him while Danielle Kenyon, a nurse, could be heard from a few cells away.  Neither Slatko nor Kenyon (nor anyone else), claims Latimer, offered him medical assistance that night. Kenyon, by contrast, attests that Latimer refused his regularly scheduled medication that evening, told her as she began to walk away from his cell that "I have a broken arm, you stupid fucking bitch," and, when she returned to follow up on the comment, threw an orange peel at the cell door towards her, a constructive refusal of further medical treatment.  *See* Kenyon Aff. ¶ 15.  Kenyon's notes from that evening align with this version of events.  *See* Reid Aff. Ex. 4 at 15.  Slatko does not remember the interaction between Kenyon and Latimer but attests that he "did not observe Latimer at any point in time on April 8, 2016 to be unresponsive on the floor of his cell."  Slatko Aff. ¶ 11.

None of these three versions of events is entirely satisfying.  Everyone admits that Latimer requested to see a nurse several times on the evening of April 8; it would

be strange for him to have then turned away Kenyon when she arrived.   Kenyon describes a colorful exchange between her and Latimer, but Slatko remembers none of this despite being on the scene when it happened and recalling other details about the evening.   For his part, Latimer's version of that evening's events has changed at least once, *see* Latimer Ex. at 7, and none of the events that followed immediately after Latimer awoke makes much sense in the context of his story.   For example, after allegedly waking from unconsciousness brought on by the initial stages of shock, with no medical assistance whatsoever having been provided despite multiple requests, Latimer nevertheless on his own telling seems to have let the issue drop and made no further calls for help that night.   What's more, the nurse on call at MCF-OPH the next day attests that Latimer refused medical treatment until the evening of April 9.   *See* Schroeder Aff. ¶ 7.   Contemporaneous medical records support this account, *see* Schroeder Aff. Ex. 1 at 2 [Docket No. 130]; Reid Aff. Ex. 4 at 15, and Latimer has never denied during the course of this litigation that he refused medical care on the morning and afternoon of April 9.

Disputes over the relative credibility of the parties and witnesses should generally be left to the factfinder to sort out at trial.   *See Gremmels v. Tandy Corp.*, 120 F.3d 103, 105 (8th Cir. 1997) ("Upon motion for summary judgment, the district court's function is neither to weigh the evidence nor make credibility determinations, but to determine if there is a genuine issue for trial.").   One exception is where a party's version of events "is blatantly contradicted by the record."   *Scott v. Harris*, 550 U.S. at 380.   Video of the incident would go a long way towards proving or disproving Latimer's claims, and the version of events offered by a party contrary to what is seen on video could be appropriately discounted on consideration of a motion for summary judgment.   And to

30

Latimer's credit, he requested the very next day that MCF-OPH officials save the recording from the security video taken from outside his cell on the evening of April 8, noting that the video would likely be relevant to forthcoming federal litigation.  *See* Latimer Ex. at 6-7.

MCF-OPH officials nevertheless allowed the recording to be deleted pursuant to the prison's video retention policy.  *See* Affidavit of Michelle Smith ("Smith Aff.") [Docket No. 83].  Latimer, not unreasonably, claims foul at the deletion of the video that he believes would have verified his version of events and that he specifically requested to be preserved long before it had been deleted.  Latimer argues that the evidentiary basis for his claims has been hopelessly compromised by the erasure of the video, and he requests that sanctions up to and including default judgment be entered against Slatko and Kenyon.  *See* Docket No. 98.

This Court is not without sympathy for Latimer's argument.[16]  Deletion of the security video taken from outside Latimer's cell was, under the circumstances,

---

[16]     The remedy Latimer seeks, however, is wide of the mark.  Neither Slatko nor Kenyon bore any responsibility for the video deletion.  *See* Smith Aff. ¶ 5.  To enter default judgment against them would be to punish Slatko and Kenyon personally for events outside their control.  *See Benike v. Minnesota Dep't of Corrections*, No. 12-CV-0207 (PAM/JJG), ECF No. 42 (D. Minn. Feb. 20, 2014) (order collecting cases and denying sanctions).  Denial of Latimer's motion for a default judgment [ECF No. 98] is therefore recommended.

The resulting impasse is vexing.  Employers and supervisors cannot be held responsible under § 1983 on a *respondeat superior* theory.  *See Vaughn v. Greene County, Arkansas*, 438 F.3d 845, 851 (8th Cir. 2006).  Oftentimes though, including here, it will be employers and supervisors, not the defendants themselves, responsible for spoliation of evidence.  Sanctions against the defendants in these instances would punish persons innocent of the spoliation and leave untouched those who were responsible.  In at least some circumstances, the appropriate response might be for the affected litigant to bring a new action for denial of access to the courts under § 1983 against the specific persons responsible for the destruction of evidence.  *See Jenkins v. Hutcheson*, No. 6:15-CV-50, 2015 WL 9480037, at *3 (S.D. Ga. Dec. 29, 2015).  It

inexplicable.  Latimer could not have been clearer to prison officials that the video would be relevant to litigation.  And even if Latimer had not asked directly that the video be retained, he submitted multiple grievances during the retention period that referenced the events at issue outside his cell on the evening of April 8.  *See, e.g.*, Compl. Ex. 1 at 37, 45, 46 [Docket No. 1-1].  If the retention procedures at MCF-OPH are lax enough to have missed Latimer's recurrent grievances, those procedures should be revised.

Because the security video no longer exists, it cannot clear up the discrepancies in the versions of events offered by the parties.  In the end, though, this factual dispute need not be resolved.  *See Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  Even taking Latimer's version of events as true, he cannot establish that Slatko or Kenyon acted with deliberate indifference to a serious medical need.  Latimer's allegations against Slatko and Kenyon amount to a claim of *delay* in medical care, not of *denial* in medical care; Latimer was getting medication by April 9, received X-rays on April 11, and saw a doctor on April 12.  Delay in medical treatment can amount to deliberate indifference, but only where evidence in the record establishes that the delay in medical treatment caused a detrimental effect.  *See Corwin v. City of Independence, Missouri*, 829 F.3d 695, 698-99 (8th Cir. 2016) (collecting cases).  Latimer was injured on the morning of April 8.  All diagnosed injuries resulting from those events were addressed by medical staff over the following days.  Even if Latimer's

---

suffices to note here, however, that to prevail on such a claim, Latimer would have to show prejudice resulting from the spoliation.  *Id.*  As explained below, Latimer's claim of deliberate indifference against Latimer and Kenyon fails not due to lack of evidence, but because at bottom the claim has been inadequately pleaded.

version of events is assumed to be true, nothing in the record suggests that the actions - or inactions - of Slatko or Kenyon worsened those injuries.

The strongest aspect of Latimer's claim (on his version of events) is that, by ignoring his duress calls, medical staff failed to dispense pain medication and thereby subjected him to greater discomfort than he otherwise would have experienced. *See Dadd v. Anoka County*, 827 F.3d 749 (8th Cir. 2016) (affirming denial of qualified immunity for claim that jail officials delayed dispersal of pain medication over multiple days). But in this case the delay fairly attributable to Slatko or Kenyon lasted *at most* about twelve hours, from the time Latimer first signaled to Slatko that he was ready for medical attention (around 8:00 p.m. on April 8) until the following morning, at which time the undisputed record shows that Latimer refused medical treatment. *See* Reid Aff. Ex. 4 at 15. Similar delays in administering pain medication have frequently been deemed insufficient to establish deliberate indifference. *See, e.g.*, *Harrell v. Grainger County, Tennessee*, No. 3:07-CV-383, 2009 WL 3241718, at *4 (E.D. Tenn. Sept. 29, 2009) (finding that a failure to administer Tylenol or ibuprofen for severe back pain over six days does not constitute a deliberate indifference to a serious medical need); *Rodriguez v. Mercado*, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (finding that delay of eight or nine hours in providing Tylenol for non-"life-threatening" or "fast-degenerating" injuries insufficient to show deliberate indifference); *Davidson v. Harris*, 960 F. Supp. 644, 648 (W.D.N.Y. 1997) (finding that delay of six to eight hours before receiving pain medication for stab wounds to back, head, and chest insufficient to show deliberate indifference). And when Latimer finally relented and agreed to speak to a nurse, over-the-counter pain medication (Tylenol) was deemed

sufficient to address his pain, a judgment later verified by Doctor Craane.  *See* Novak
Aff. Ex. at 9.

    None of this is to condone the actions of Slatko and Kenyon, if Latimer's version
of events is correct (though again, there is reason to believe his version of events may
not be correct).  At a minimum, defendants would have taken a needless risk in
knowingly leaving an incapacitated prisoner on the floor of his cell without providing
medical treatment or summoning someone else to provide treatment.  But Latimer was
none the worse as a result; he cannot tie any deterioration of injury to the alleged delay
caused by Slatko and Kenyon.  Latimer's deliberate-indifference claim against them
therefore fails.

    **(3)    Defendant Craane**

    Beginning on April 12, 2016 (four days after the cell entry) and several times
thereafter, Doctor Stephen Craane examined Latimer both for injuries suffered around
the time of the cell entry and for other, more quotidian medical concerns.  Latimer
alleges that Craane's performance was so deficient in several respects as to amount to
deliberate indifference to his medical needs.

    The majority of Latimer's complaints with respect to Craane's performance are
unsupported by the record, amount to mere disagreement over treatment choices, or
both.  For example, Latimer alleges that Craane persistently ignored injuries to his right
thumb incurred during the cell entry.  But Craane examined Latimer's thumb on several
occasions, going so far as to order that X-rays be taken, and found no injury.  *See*
Novak Aff. Ex. at 1, 9, 10.[17]  Latimer has provided no countervailing medical evidence.

---

[17]    Craane's treatment notes from June 1, 2016 report that Latimer "voices a
conviction that his right thumb is 'broken.'  He does not state exactly how this happened

Much the same can be said of Latimer's alleged injuries to his right wrist, none of which were medically determined. Latimer also alleges generally that Craane should have done more to alleviate pain caused by the injuries, but Latimer took medication for pain throughout the relevant period, and Craane had good reasons *not* to prescribe other pain medication. *See* Novak Aff. Ex. at 9 (noting potential complications caused by ibuprofen). Although Latimer may believe that Craane should have prescribed something stronger for his bruises and broken wrist, "disagreement with . . . treatment decisions is not actionable under § 1983." *Reid v. Griffin*, 808 F.3d 1191, 1192 (8th Cir. 2015) (per curiam).

The weightiest of Latimer's deliberate-indifference allegations against Craane relate to his claimed hallucinations and memory loss, which Latimer insists Craane refused to treat or even acknowledge. When and how Latimer presented complaints of these injuries to Craane is not entirely clear from the record. Latimer insists that he told Craane about hallucinations and memory loss on April 12, 2016, the first occasion on which Craane examined Latimer following the cell entry. Craane's notes from that examination, though, do not mention that Latimer complained of hallucinations or memory loss. *See* Novak Aff. Ex. at 11. Craane's notes do mention complaints of generalized headaches, but also state that Latimer had reported "no activity or trauma which preceded the onset of these headaches" and that Latimer "relates no associated visual difficulties, dyspnea or nausea." *Id.* There is good reason to think Craane's notes are accurate, as Latimer's grievance kites and other notes from April 12 and earlier also do not reference hallucinations or memory loss, despite mentioning several

---

but held up his right thumb in a crooked fashion to demonstrate the 'fracture' (however, when the patient was asked to extend the digits of this hand, he was able to extend this digit in a completely straight fashion)." Novak Aff. Ex. at 10.

other maladies.  *See, e.g.*, Latimer Ex. at 2-3 [Docket No. 145].  Craane could not have been deliberately indifferent to medical problems that he had no reason to know about.

Complicating matters is that, by April 14, Latimer was consistently mentioning hallucinations and memory loss to prison staff, including in requests for sick call.  *See* Compl. Ex. 1 at 37; Compl. Ex. 2 at 16-17, 50 [Docket No. 1-2].  And yet none of Craane's medical records from around or after this period mention that Latimer had mentioned these concerns to him.  *See* Novak Aff. Ex. A.  One plausible inference from the silence of the medical records compiled by Craane is that, despite Latimer not being shy about these injuries around everyone else, he did not mention them to Craane during any of the examinations.  But also plausible, at least after April 14, is Latimer's claim that he *did* mention the concerns to Craane, who buried the complaints.[18]

At bottom, though, Latimer must provide evidence from which a factfinder could conclude that he in fact suffered from an objectively serious medical need that went deliberately untreated.  *See Scott v. Benson*, 742 F.3d at 340.  "A medical need is objectively serious if it either has been 'diagnosed by a physician as requiring treatment' or is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"  *Id.* (quoting *Coleman*, 114 F.3d at 784).  Latimer has provided no evidence that he has ever been diagnosed with a head injury that could cause hallucinations or memory loss, and neither of these internal injuries would be so obvious that anyone would have recognized them just from observing Latimer for short period of time, as Craane did.

---

[18]    Mere negligence in diagnosing a medical condition does not amount to an Eighth Amendment violation, *see Gregoire v. Class*, 236 F.3d 413, 418 (8th Cir. 2000) (citing *Estelle*, 429 U.S. at 106), but Latimer alleges more than merely he had exhibited signs of a head injury that Craane failed to catch.  Instead, Latimer's claim is that Craane affirmatively and deliberately refused to consider that he had suffered a head injury.

Of course, the crux of Latimer's claim is that Craane, the medical professional he consulted for the injuries, refused to offer a proper diagnosis, possibly for perfidious reasons. But other medical providers also failed to diagnose Latimer with any head or brain injury, much less an objectively serious head injury requiring treatment. *See* Latimer Dep. at 71, 73. Nor has Latimer shown, assuming (contrary to the evidence in the record) that he did in fact suffer an objectively serious head injury, how Craane's lack of diagnosis made that injury worse. *See Jackson v. Riebold*, 815 F.3d 1114, 1119-20 (8th Cir. 2016) (collecting cases for proposition that inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." (quotation omitted)).

A factfinder could not reasonably conclude, based on the evidence in the record, that Craane was deliberately indifferent to any of Latimer's established objectively serious medical needs. Craane's motion for summary judgment should therefore be granted, and Latimer's motion for summary judgment should be denied with respect to Craane.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, THE COURT RECOMMENDS THAT:

1.      The Motion for Summary Judgment of Plaintiff Mark William Latimer [Docket No. 71] be DENIED.

2.      Latimer's Motion for a Default Judgment [Docket No. 98] be DENIED.

3.      The Motion for Summary Judgment of Defendant Stephen Craane [Docket No. 102] be GRANTED.

4.      The Motion for Summary Judgment of Defendants Michelle L. Smith, John Magadanz, Brian Gette, Derek Magle, Kathy Reid, Kelly Classen, Dean Slatko, and Danielle Kenyon [Docket No. 110] be GRANTED.

5.      Latimer's Motion in Opposition [Docket No. 143] be GRANTED IN PART and DENIED IN PART, as explained above.


Dated:      July 20, 2018

_s/ David T. Schultz_
DAVID T. SCHULTZ
United States Magistrate Judge


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).